**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, CONCORD BICYCLE ASSETS, LLC, CMGI RECORDED MUSIC ASSETS LLC, SONY MUSIC ENTERTAINMENT, and ARISTA MUSIC, *Plaintiffs*, v. INTERNET ARCHIVE, BREWSTER KAHLE, KAHLE/AUSTIN FOUNDATION, GEORGE BLOOD, and GEORGE BLOOD L.P., *Defendants*. | Case No. 1:23-cv-07133-LGS-JW |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO TRANSFER VENUE**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................3

    A.    Context Of The Great 78 Project ..............................................................3

    B.    Execution Of The Great 78 Project.............................................................5

    C.    Procedural History Of This Litigation ........................................................6

LEGAL STANDARD.................................................................................................8

ARGUMENT .............................................................................................................9

I.     THE NORTHERN DISTRICT OF CALIFORNIA IS A PROPER FORUM ....................9

    A.    The Northern District Of California Has Subject Matter Jurisdiction And Is A Proper Venue...................................................................9

    B.    The Northern District Of California Has Personal Jurisdiction Over All The Defendants, Unlike This Court....................................................10

II.    THE INTERESTS OF JUSTICE SUPPORT TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA .......................................................15

    A.    The Locus Of Operative Facts For This Case Is The Northern District Of California ..........................................................................16

    B.    Transfer To The Northern District Of California Would Provide Easier, Efficient, And Effective Access To The Evidence And Witnesses At The Heart Of This Case...................................................19

    C.    The Relative Means And Convenience Of The Parties Are Neutral Factors ........22

    D.    Plaintiffs' Choice Of Forum Is Entitled To Little Weight And Outweighed By Other Factors ......................................................23

CONCLUSION.........................................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AGCS Marine Ins. Co. v. Associated Gas & Oil Co.*,
 775 F. Supp. 2d 640 (S.D.N.Y. 2011)......................................................................................9

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)..............................................................................................................12

*Aspen Specialty Ins. Co. v. RCI Hosp. Holdings, Inc.*,
 2023 WL 4080550 (S.D.N.Y. June 20, 2023) ......................................................................15

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
 571 U.S. 49 (2013).................................................................................................................8

*Berdeaux v. OneCoin Ltd.*,
 561 F. Supp. 3d 379 (S.D.N.Y. 2021)...................................................................................11

*Blue Ribbon Pet Prod., Inc. v. Rolf C. Hagen (USA) Corp.*,
 66 F. Supp. 2d 454 (E.D.N.Y. 1999) ....................................................................................13

*Brown v. Lockheed Martin Corp.*,
 814 F.3d 619 (2d Cir. 2016)..................................................................................................10

*Burger King Corp. v. Rudzewicz*,
 471 U.S. 462 (1985)..............................................................................................................14

*Capitol Records, LLC v. VideoEgg, Inc.*,
 611 F. Supp. 2d 349 (S.D.N.Y. 2009)....................................................................17, 20, 23

*Cohn v. Metro. Life Ins. Co.*,
 2007 WL 1573874 (S.D.N.Y. May 31, 2007) ......................................................................16

*CYI, Inc. v. Ja-Ru, Inc.*,
 913 F. Supp. 2d 16 (S.D.N.Y. 2012).....................................................................................20

*D.H. Blair & Co. v. Gottdiener*,
 462 F.3d 95 (2d Cir. 2006)......................................................................................................8

*Daimler AG v. Bauman*,
 571 U.S. 117 (2014)..............................................................................................................10

*Dennis v. JPMorgan Chase & Co.*,
 343 F. Supp. 3d 122 (S.D.N.Y. 2018)...................................................................................11

*Dickerson v. Novartis Corp.*,
    315 F.R.D. 18 (S.D.N.Y. 2016) ...............................................................21, 22

*Dr. Boy GmbH v. Nationwide Ins.*,
    1996 WL 350699 (S.D.N.Y. June 25, 1996) ........................................................16

*Enigma Software Grp. USA, LLC v. Malwarebytes Inc.*,
    260 F. Supp. 3d 401 (S.D.N.Y. 2017) ............................................................15, 19

*Eres N.V. v. Citgo Asphalt Refining Co.*,
    605 F. Supp. 2d 473 (S.D.N.Y. 2009) ............................................................15, 20

*Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*,
    928 F. Supp. 2d 735 (S.D.N.Y. 2013) ...............................................14, 15, 16, 22

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021) .........................................................................................12

*Freeplay Music, LLC v. Gibson Brands, Inc.*,
    195 F. Supp. 3d 613 (S.D.N.Y. 2016) .................................................................20

*Fuji Photo Film Co. v. Lexar Media, Inc.*,
    415 F. Supp. 2d 370 (S.D.N.Y. 2006) ............................................................21, 24

*G. Angel Ltd. v. Camper & Nicholsons USA, Inc.*,
    2008 WL 351660 (S.D.N.Y. Feb. 8, 2008) .........................................................15

*Garnish & Gather, LLC v. Target Corp.*,
    2019 WL 6729152 (S.D.N.Y. Dec. 11, 2019) .....................................................23

*Gucci America, Inc. v. Frontline Processing Corp.*,
    721 F. Supp. 2d 228 (S.D.N.Y. 2010) .................................................................13

*Harris v. Brody*,
    476 F. Supp. 2d 405 (S.D.N.Y. 2007) .................................................................23

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984) .............................................................................................13

*Herbert LP v. Electronic Arts Inc.*,
    325 F. Supp. 2d 282 (S.D.N.Y. 2004) .................................................................22

*Iyalla v. TRT Holdings, Inc.*,
    2005 WL 1765707 (S.D.N.Y. July 25, 2005) .....................................................24

*Mohamed v. Tesfaye*,
    2019 WL 1460401 (S.D.N.Y. Jan. 24, 2019) .....................................................15

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
  599 F.3d 102 (2d Cir. 2010)...........................................................................8

*Pence v. Gee Grp., Inc.*,
  236 F. Supp. 3d 843 (S.D.N.Y. 2017)...........................................................23

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
  946 N.E.2d 159 (N.Y. 2011)..........................................................................11

*Rindfleisch v. Gentiva Health Sys., Inc.*,
  752 F. Supp. 2d 246 (E.D.N.Y. 2010) ..........................................................23

*SBAV LP v. Porter Bancorp., Inc.*,
  2013 WL 3467030 (S.D.N.Y. July 10, 2013) ................................................15

*Smart Skins LLC v. Microsoft Corp.*,
  2015 WL 1499843 (S.D.N.Y. Mar. 27, 2015) ....................................18, 22, 23

*Smart v. Goord*,
  21 F. Supp. 2d 309 (S.D.N.Y. 1998)..............................................................16

*Snowbridge Advisors LLC v. ESO Cap. Partners UK LLP*,
  589 F. Supp. 3d 401 (S.D.N.Y. 2022)............................................................11

*Stewart v. adidas AG*,
  1997 WL 218431 (S.D.N.Y. Apr. 30, 1997) ..................................................13

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 659 (2d Cir. 2013)...........................................................................14

*Viacom Int'l Inc. v. Melvin Simon Prods., Inc.*,
  774 F. Supp. 858 (S.D.N.Y. 1991) ...........................................................2, 16

*Walden v. Fiore*,
  571 U.S. 277 (2014).................................................................................12, 13

*Whitehaus Collection v. Barclay Prods., Ltd.*,
  2011 WL 4036097 (S.D.N.Y. Aug. 29, 2011)................................................23

**STATUTES**

28 U.S.C.
  § 1331....................................................................................................................9
  § 1391(b)(2) ..........................................................................................................9
  § 1404(a) ....................................................................................................8, 9, 16

**RULES**

Fed. R. Civ. P. 45(c)(A)...........................................................................................21

N.Y. C.P.L.R. § 302(a)(3)(i)-(ii) .................................................................................................11

## OTHER AUTHORITIES

*About the Internet Archive*, Internet Archive, https://archive.org/about/ (last visited
    Oct. 31, 2023) ..........................................................................................................................3

Amanda Petrusich, *Do Not Sell At Any Price* (2014) ...................................................................3

Amanda Petrusich, *They've Got Those Old, Hard-to-Find Blues*, N.Y. Times (July 8,
    2009) ........................................................................................................................................5

Dani Deahl, *Over 50,000 Digitized Pieces of Vinyl Can Now Be Listened to on
    Internet Archive*, Verge (Aug. 12, 2017),
    https://www.theverge.com/2017/8/12/16126346/50000-digitized-vinyl-internet-
    archive-great-78-project..........................................................................................................6

*The Great 78 Project*, Internet Archive, https://great78.archive.org/ (last visited Oct.
    31, 2023) .........................................................................................................................5, 6, 19

*How Do I Make a Physical Donation to the Internet Archive?*, Internet Archive,
    https://help.archive.org/help/how-do-i-make-a-physical-donation-to-the-internet-
    archive/ (last visited Oct. 31, 2023) ........................................................................................5

K.J. Greene, *"Copynorms," Black Cultural Production, and the Debate Over
    African-American Reparations*, 25 Cardozo Arts & Ent. L.J. 1179 (2008) ...........................7

Kelsey Kennedy, *A Wayback Machine for Early 20th Century Tunes*, Atlas Obscura
    (May 4, 2017), https://www.atlasobscura.com/articles/internet-archive-78-
    records-phonograph ..................................................................................................................4

Matt Stahl & Olufunmilayo Arewa, *Denying Black Musicians Their Royalties Has a
    History Emerging Out of Slavery*, Conversation (May 12, 2021),
    https://theconversation.com/denying-black-musicians-their-royalties-has-a-
    history-emerging-out-of-slavery-144397..................................................................................7

Pekka Gronow, *The World's Greatest Sound Archive: 78 RPM Records as a Source
    for Musicological Research*, 43 Traditiones 31 (2014) .......................................................3, 4

*Process*, George Blood L.P., https://www.georgeblood.com/process (last visited Oct.
    31, 2023) ...................................................................................................................................5

## PRELIMINARY STATEMENT

Defendants respectfully move for an order transferring this litigation from the Southern District of New York, which has no evident connection to the principal plot points of the claims asserted, to the Northern District of California, which is a more sensible forum for a variety of reasons.

The complaint in this case seeks to condemn a technological initiative to preserve a fast-disappearing part of this country's cultural heritage:  the sounds of 78 rpm records, a widely used format for distributing recorded music from the late 19th century through the 1950s.  The peculiar and distinct crackles and imperfections of this medium formed an indelible part of the fabric of American society for many decades.  But the physical objects themselves tend to disintegrate over time—and as the complete set of these old records gradually becomes unplayable, their unique contribution to our history is on a precipitous path to being lost forever.

Defendant Internet Archive is a not-for-profit research library.  For nearly two decades, it has been involved in efforts to preserve 78 rpm records.  Over six years ago, the Archive joined with a number of other libraries and related institutions to launch the Great 78 Project, an ambitious undertaking to systematically digitize the sounds of these old relics—hisses, pops, and all—in order to preserve them for scholars and future generations.  More than three years ago (now well outside the statute of limitations for challenging any digitization that had occurred as of that date) Plaintiff record labels sent a letter expressing their disapproval of that project.  Internet Archive promptly responded (through Defendant Brewster Kahle, the founder of Internet Archive) that the project would gladly exclude any recordings of the labels' that they identified.  The record labels never responded to that letter.

Out of the blue, in August of this year, the record labels sued.  They named as Defendants the Archive itself; Kahle; the contractor with whom the Archive collaborated on its digitization

1

efforts, George Blood (a specialist who frequently works with record labels themselves); George Blood's company, George Blood L.P. ("GBLP"); and, for some reason, the separate philanthropic foundation that Kahle co-founded, the Kahle/Austin Foundation.   (The Foundation has no relationship whatsoever to the Great 78 Project.)

It is unclear why the Plaintiffs chose to file this lawsuit in this Court.  None of these actors has any connection to the state or city of New York.  None are located here.  The Great 78 Project has no specific connection to this jurisdiction.  And no portion of the allegedly infringing conduct that Plaintiffs describe in their complaint took place in this district, except for end-users based in New York who listened to the digitized recordings at issue—no different from end-users in any other.

By contrast, the allegations in the complaint do point to a particular and different "center of gravity" of this litigation—the Northern District of California.  *Viacom Int'l Inc. v. Melvin Simon Prods., Inc.*, 774 F. Supp. 858, 868 (S.D.N.Y. 1991).  That is the place where the Internet Archive is headquartered, where many of the 78 rpm records that underlie the Great 78 Project are received, organized, and preserved, and from which the Internet Archive oversees and manages its share of the Great 78 Project's operations.  That is why all Defendants seek transfer to that district.

The standard for transfer is squarely met here.  The Northern District of California is a proper venue, with subject matter jurisdiction and personal jurisdiction over all the Defendants here—unlike the Southern District of New York, in which personal jurisdiction is at best highly contestable.  And the interests of justice favor transfer to Northern District of California, which is not only the location with the most material connections to the facts underlying this case, but also is the location with the easiest, most efficient, and most convenient access to the evidence and witnesses that will be necessary to litigate this case.  Under the circumstances presented, Plaintiffs'

choice of the Southern District of New York is entitled to little weight.  All but two of these Plaintiffs reside elsewhere—indeed, two of them reside in *California*.  And the Southern District of New York has no material connection to any aspect of the alleged infringement that underlies Plaintiffs' claims.  The motion should be granted.

## BACKGROUND

### A.    Context Of The Great 78 Project

The Internet Archive is a not-for-profit research library founded by Brewster Kahle in 1996.  Compl. ¶ 29, 47.  The organization is perhaps best known for its "Wayback Machine," which has archived billions of web pages going back 26 years, and provides free access to these historical materials for researchers, academics, and the public.  *See About the Internet Archive*, Internet Archive, https://archive.org/about/ (last visited Oct. 31, 2023).  Beyond the Wayback Machine, the Internet Archive works to catalogue, preserve, and provide public access to a wide variety of other materials of significant cultural and historical importance.  *Id.*  One of these initiatives is the "Great 78 Project," which works to collect, preserve, and digitize 78 revolutions per minute ("rpm") music records.  Compl. ¶ 48.

"The 78 rpm record was introduced in the 1890s, about ten years after Thomas Edison developed his phonograph machine and revolutionized the ways human beings thought about sound."  Amanda Petrusich, *Do Not Sell At Any Price* 10 (2014) (hereinafter "Petrusich").  Often made out of a brittle shellac resin material, rather than the vinyl that is used for records today, "78s" became "the standard format of sound recordings" throughout "the first half of the twentieth century," and "at least a million titles had been issued by various record companies around the world" in the 78 rpm format by the late 1950s.  Pekka Gronow, *The World's Greatest Sound Archive: 78 RPM Records as a Source for Musicological Research*, 43 Traditiones 31, 32 (2014).  By the 1960s, however, 78 rpm records fell out of favor, and were "gradually replaced by" newer

formats, like "seven-inch, two-song 45s and twelve-inch, long-playing 33$^1/_3$ records."  Petrusich, *supra*, at 10.

Because of the materials used to produce 78 rpm records, and the technology and method used to record the music onto the records, the sound of a 78 rpm record differs significantly from the music that most modern listeners are accustomed to hearing on digital streaming services like Spotify or Apple Music.  "Depending on the quality of the recording and the condition of the disc, there's often a high and persistent background hiss" or the sound "might be fully obscured by a staticky sizzle." *Id.* at 17.  Preserving these records as they would have been heard and experienced by listeners at the time they were made is a critically important part of archiving these works.  By painstakingly digitizing the actual sounds produced by the physical objects—imperfections and all—one is able to "captur[e] an era."  Kelsey Kennedy, *A Wayback Machine for Early 20th Century Tunes*, Atlas Obscura (May 4, 2017), https://www.atlasobscura.com/articles/internet-archive-78-records-phonograph.  Moreover, 78 rpm records "contain important recordings that capture the evolution of music in the early 20th century, including rare jazz and blues, old hillbilly, and some of the earliest examples of rock 'n' roll," many of which were never transferred from 78s to other mediums. *Id.*  For example, Aileen Stanley was "one of the most popular singers of the 1920s, who sold some 25 million records," but her music "can only be found on rare 78s" today. *Id.*

Despite their popularity throughout the first half of the twentieth century, 78 rpm records are a uniquely "finite resource."  Petrusich, *supra*, at 4.  Because of the materials used for their construction, they "are thick, brittle, and heavy," *id.* at 14, and "are remarkably fragile," *id.* at 4.  And many 78 rpm records were "produced in very limited quantities."  *Id.*  For these reasons, "[t]he stakes are . . . high from a preservationist standpoint" for continued access to the unique

sound of 78 rpm records.  Amanda Petrusich, *They've Got Those Old, Hard-to-Find Blues*, N.Y. Times (July 8, 2009), https://www.nytimes.com/2009/07/12/arts/music/12petr.html.

**B.      Execution Of The Great 78 Project**

In recognition of the importance of 78 rpm records to our shared cultural heritage, the Internet Archive and its partners launched the Great 78 Project more than six years ago to collect, preserve, and digitize 78 rpm records, and the unique sound they provide, for the benefit of researchers, historians, members of the public, and future generations.  *See* Compl. ¶¶ 48-49; *The Great 78 Project*, Internet Archive, https://great78.archive.org/ (last visited Oct. 31, 2023) (hereinafter "*The Great 78 Project*").  The first step in that process is the collection of physical 78 rpm records.  Collectors interested in donating their physical records to the Great 78 Project can deliver or ship their records to the Internet Archive in the San Francisco Bay Area.  *See The Great 78 Project* (inviting the public to "Donate 78s"); *How Do I Make a Physical Donation to the Internet Archive?*, Internet Archive, https://help.archive.org/help/how-do-i-make-a-physical-donation-to-the-internet-archive/ (last visited Oct. 31, 2023).

After the physical records are received by the Great 78 Project, they are catalogued and the sound recordings are digitized.  The Internet Archive and the Great 78 Project partnered with GBLP for professional digitization of 78 rpm records.  *See* Compl. ¶¶ 12, 48-49; *see also* Nov. 1, 2023 Decl. of Brewster Kahle ("Kahle Decl.") ¶ 4.  The physical 78 rpm records are shipped to GBLP at its offices in Pennsylvania.  *See* Compl. ¶¶ 32-33; Kahle Decl. ¶ 5.  The digitization process involves an engineer using sophisticated equipment and software to transfer the source media of the 78 rpm record into a digital format that be archived electronically and accessed and played digitally.  *See Process*, George Blood L.P., https://www.georgeblood.com/process (last visited Oct. 31, 2023).  That digitization process includes the use of "different sizes and shapes of stylus" to digitize the same recordings. *The Great 78 Project*; *see also* Kennedy *supra* (describing

how GBLP uses a "turntable with four styluses—each a different size to pick up the sound in a distinct way"). The size and shape of the stylus determines the sound generated by the record, because the stylus affects the vibrations generated in response to the variations in the record's grooves. By capturing the differences in sound generated by different styluses, this recording process "facilitate[s] different kinds of analysis" by researchers. *The Great 78 Project*. Creating those kinds of varied examples of recordings is important to preserve these works as they would have been heard and experienced at the time they were created. *See* Dani Deahl, *Over 50,000 Digitized Pieces of Vinyl Can Now Be Listened to on Internet Archive*, Verge (Aug. 12, 2017), https://www.theverge.com/2017/8/12/16126346/50000-digitized-vinyl-internet-archive-great-78-project ("[D]ifferent types of styluses can affect how a record sounds when played, and playback speeds were not standardized until around the late '20s, meaning there is debate about the 'correct speed' at which a record should be played.").

After the records have been digitized, the physical records are stored for long-term preservation. *See The Great 78 Project: Preservation*, Internet Archive, https://great78.archive.org/preservation/ (last visited Oct. 31, 2023). Those physical records are stored either in the San Francisco Bay Area or in Pennsylvania. Kahle Decl. ¶ 5. And the digital versions of the recordings are uploaded to the Great 78 Project's website by the Internet Archive, where they can be accessed by researchers, historians, and members of the public to stream online. *See* Compl. ¶¶ 48-49; Kahle Decl. ¶¶ 4-5. The servers hosting these websites are located in San Francisco and Richmond, California. Kahle Decl. ¶ 3.

### C.   Procedural History Of This Litigation

On July 22, 2020—several years after the launch of the Great 78 Project—the Recording Industry Association of America ("RIAA"), a trade association for record labels and other members of the recording industry, sent a letter to the Internet Archive asserting that the Great 78

Project had infringed its members' copyrights by digitizing and making certain works (the letter did not identify which ones) available for streaming on the internet.  Compl. ¶ 80.  The Internet Archive responded, offering to discuss removal of specific works with the RIAA and its members to the extent that there are "particular recordings" that the members could identify.  Compl. ¶ 81. The RIAA and its members never responded.

More than three years later, Plaintiffs abruptly filed this lawsuit on August 11, 2023.  *See generally* Compl. at 1.  Plaintiffs are six record labels—Sony Music Entertainment, Arista Music, UMG Recordings, Capitol Records, Concord Bicycle Assets ("CBA"), and CMGI Recorded Music Assets.  Compl. ¶¶ 21-27.  Plaintiffs allege that they "own and/or control in whole or in part the exclusive rights in innumerable sound recordings" that have been "infringed by Defendants through the Great 78 Project."  Compl. ¶ 28.  Given the age of most of the recordings preserved by the Great 78 Project, Plaintiffs' claims depend on tracing the chain of title of their alleged copyrights as far back as the turn of the twentieth century (or farther).  *Cf.* ECF No. 1-1 (table of alleged sound recordings at issue).[1]

Plaintiffs allege claims for direct infringement, contributory infringement, inducement of infringement, and vicarious infringement under the Copyright Act.  *See* Compl. ¶¶ 94-198.  While the Complaint is somewhat opaque with respect to which causes of action apply to what alleged conduct, it appears to assert separate theories of liability with respect to (a) "copying 78 rpm

---

[1] Indeed, many of the recordings in this case date to a uniquely sordid period in recording history, in which record labels pervasively discriminated against African-American artists through dubious contracting practices and outright fraud.  *See, e.g.*, K.J. Greene, *"Copynorms," Black Cultural Production, and the Debate Over African-American Reparations*, 25 Cardozo Arts & Ent. L.J. 1179, 1204-07 (2008); Matt Stahl & Olufunmilayo Arewa, *Denying Black Musicians Their Royalties Has a History Emerging Out of Slavery*, Conversation (May 12, 2021), https://theconversation.com/denying-black-musicians-their-royalties-has-a-history-emerging-out-of-slavery-144397.

physical records . . . into digital files," (b) "copying those recordings to a server," and (c) transferring or streaming those files to the public.  Compl. ¶ 9.  Of those forms of activity, those described in (a) happened in Pennsylvania, Compl. ¶¶ 32-33, 48-49; those described in (b) happened between Pennsylvania and the San Francisco Bay Area, Kahle Decl. ¶¶ 3-5; *see also* Compl. ¶¶ 9, 12, 29, 32-33, 48-49; and those described in (c) happened all over the country, with no particular focus on New York.  With respect to the conduct that allegedly gave rise to *secondary* liability for Defendants other than Internet Archive, there is no allegation that any of it happened in New York.

## LEGAL STANDARD

Motions to transfer venue are governed by 28 U.S.C. § 1404(a), which provides:  "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

When considering a motion to transfer venue pursuant to § 1404(a), courts balance several factors, including:  "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties."  *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006)); *see also Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62-63 & n.6 (2013) (discussing the public and private interest factors).

## ARGUMENT

## I.    THE NORTHERN DISTRICT OF CALIFORNIA IS A PROPER FORUM

The first question under § 1404(a) is whether the action "might have been brought" in the transferee district.  This analysis asks whether "subject matter jurisdiction, personal jurisdiction and venue all [were] proper in the proposed transferee court at the time the action was filed." *AGCS Marine Ins. Co. v. Associated Gas & Oil Co.*, 775 F. Supp. 2d 640, 646 (S.D.N.Y. 2011). The Northern District of California satisfies each of these requirements.  It therefore is a judicial district where this action might have been brought.

### A.    The Northern District Of California Has Subject Matter Jurisdiction And Is A Proper Venue

First, subject matter jurisdiction is proper in the Northern District of California, because Plaintiffs' claims arise under the Copyright Act, *see* Compl. ¶¶ 94-198, and the Northern District of California has federal-question subject matter jurisdiction over those claims, *see* 28 U.S.C. § 1331.

Second, venue is proper in the Northern District of California.  Venue is proper in a district if (among other things), it is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b)(2).  Here, venue is proper in the Northern District of California because the vast majority of the events underlying Plaintiffs' claims took place in that district.  Plaintiffs' claims are premised on the digitization of physical 78 rpm records, the uploading of those records to the internet, and the streaming of those songs by internet users via Internet Archive's website.  Each of these activities takes place in or is coordinated from the Internet Archive's headquarters in California—from the collection of the physical records themselves, to the digitization process negotiated with Blood and GBLP and overseen by Internet Archive, to the management of the process of uploading those recordings to the Internet Archive's

website, and maintaining of that website where users can stream the digitized recordings. *See, e.g.*, Compl. ¶¶ 8-10, 12, 29, 31-33, 48-49, 63; *see supra* at 5-6. For this reason, venue is proper in the Northern District of California.

**B.     The Northern District Of California Has Personal Jurisdiction Over All The Defendants, Unlike This Court**

The Northern District of California is also a proper forum for hearing this case because it has personal jurisdiction over all of the Defendants. The clear case for personal jurisdiction in the Northern District of California stands in stark contrast to the lack of jurisdiction over multiple Defendants in this Court.

The Internet Archive is a California not-for-profit corporation with its principal place of business in San Francisco. Compl. ¶ 29. And Kahle is a resident of and domiciled in California. Compl. ¶ 31. Because both these Defendants are "at home" in California, they are subject to general personal jurisdiction in that forum. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." (citation omitted)). Likewise, the Foundation has its principal place of business in San Francisco, which similarly makes personal jurisdiction appropriate in California. Compl. ¶ 30. And Defendants George Blood and GBLP stipulate that they are subject to personal jurisdiction in California for these claims. *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 625 (2d Cir. 2016) ("[A] party may simply consent to a court's exercise of personal jurisdiction."). Thus, the Northern District of California has personal jurisdiction over all Defendants here.

By contrast, this Court lacks personal jurisdiction over Defendants Kahle, Blood, GBLP, and the Foundation, or at a minimum there are serious questions about the Court's authority over these Defendants. To establish personal jurisdiction over the Defendants here, Plaintiffs must

allege a prima facie case under both New York's long-arm statute and federal due process principles. *See Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 396 (S.D.N.Y. 2021). But Plaintiffs cannot satisfy either of these requirements.

As to New York's long-arm statute, personal jurisdiction is available over an out-of-state defendant for a tort committed out-of-state only if the defendant's conduct "caus[ed] injury to person or property within the state" and the defendant either (i) "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state," or (ii) "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." N.Y. C.P.L.R. § 302(a)(3)(i)-(ii) (McKinney). But there can be no "injury in New York" for the claims asserted by UMG, Capitol Records, CBA, or CMGI, because they are not "New York copyright owners." *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 946 N.E.2d 159, 161-62 (N.Y. 2011) (holding that location of injury is "the residence or location of the principal place of business of the copyright holder"); Compl. ¶¶ 24-27 (alleging incorporation and principal places of business in Delaware, California, and Tennessee). Accordingly, the claims asserted by these Plaintiffs did not "cause injury" in New York. *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 197 (S.D.N.Y. 2018) ("A plaintiff 'must establish the court's jurisdiction with respect to each claim asserted.'" (citation omitted)).

And more fundamentally, the complaint does not allege in more than "conclusory fashion" that Kahle, Blood, GBLP, or the Foundation (i) regularly conduct business in New York or derive substantial revenue from interstate or international commerce, or (ii) reasonably should have expected their actions to have an effect in New York. *See, e.g.*, Compl. ¶¶ 36-39, 40-42. That is not sufficient to create personal jurisdiction under New York law. *See, e.g.*, *Snowbridge Advisors*

11

*LLC v. ESO Cap. Partners UK LLP*, 589 F. Supp. 3d 401, 415 (S.D.N.Y. 2022) (holding that complaint's "insufficient" and "conclusory" allegations did not establish personal jurisdiction under § 302). Indeed, the complaint's allegations are little more than a bare recitation of the statutory standard. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (citation omitted)). Plaintiffs have not sufficiently alleged—and cannot allege—jurisdiction over any of Plaintiffs' claims against these Defendants under New York law.

Moreover, even assuming that Plaintiffs could satisfy New York's long-arm statute, personal jurisdiction is unavailable here for the independent reason that Plaintiffs cannot satisfy federal due process requirements. Here, Plaintiffs must establish "specific" or "case-linked" personal jurisdiction over each Defendant. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024-25 (2021). To establish specific personal jurisdiction over a defendant, it must be shown that the defendant has sufficient "minimum contacts" with the forum state, and that the plaintiff's claims "arise out of" or "relate to" those contacts. *Walden v. Fiore*, 571 U.S. 277, 284-85 (2014). Here, Plaintiffs have failed to allege any (let alone minimum) specific contacts between Kahle, Blood, GBLP, and the Foundation and New York that relate to Plaintiffs' claims of infringement. At most, the complaint alleges that Defendants "knew about and materially contributed to" the Internet Archive's infringement, that Plaintiffs were injured in New York, and that New York residents have downloaded or streamed recordings from the Great 78 Project. *See* Compl. ¶ 37. But these allegations are insufficient as a matter of law to create personal jurisdiction over Kahle, Blood, GBLP, or the Foundation here.

Starting with Plaintiffs' allegations that Kahle, Blood, GBLP, and the Foundation "contributed to" the Internet Archive's infringement, Plaintiffs have suggested that a court can

exercise personal jurisdiction over a contributory infringer whenever it can exercise personal jurisdiction over the direct infringer.  That is wrong.  As the Supreme Court made clear in *Walden v. Fiore*, the key to assessing personal jurisdiction is the connections "that the defendant *himself* creates with the forum State."  571 U.S. at 284 (emphasis in original) (citation and internal quotation omitted).  For that reason, the "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984).[2]  Thus, Plaintiffs must still establish that Kahle, Blood, GBLP, or the Foundation *themselves* engaged in conduct that both (i) creates their alleged liability for contributory infringement and (ii) is connected to New York.  The complaint is devoid of such allegations.  Instead, the allegations that Kahle directed and oversaw the Internet Archive's alleged infringement, that the Foundation contributed funds that the Internet Archive ultimately used to infringe, or that Blood and GBLP contributed to that infringement through digitizing recordings, all happened *in other states*—those activities are not remotely connected to or directed at New York in particular.

Nor do Plaintiffs' allegations that it was foreseeable that users would stream recordings in New York or that Plaintiffs would be injured in New York suffice to create personal jurisdiction.  That argument depends on the mere foreseeability of injury in New York—the same kind of

---

[2] Plaintiffs have pointed to cases like *Gucci America, Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228 (S.D.N.Y. 2010), as supporting their theory about tagging personal jurisdiction to contributory infringers.  *See* ECF No. 41-1 at 1.  To the extent that *Gucci* stands for that proposition at all, it cannot survive the Supreme Court's decision in *Walden v. Fiore*.  And Plaintiffs' other cases are even further afield, since they involved attributing the acts of affiliated corporate entities (like an American subsidiary of a foreign corporation) to the parent corporation, and predate *Walden* by more than 15 years.  *See id.* at 1-2 (citing *Stewart v. adidas AG*, 1997 WL 218431 (S.D.N.Y. Apr. 30, 1997); *Blue Ribbon Pet Prod., Inc. v. Rolf C. Hagen (USA) Corp.*, 66 F. Supp. 2d 454 (E.D.N.Y. 1999)).

argument that the Supreme Court and the Second Circuit have repeatedly rejected as sufficient to create the minimum contacts necessary to establish personal jurisdiction.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) ("Although it has been argued that foreseeability of causing injury in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a 'sufficient benchmark' for exercising personal jurisdiction." (citation and footnote omitted)); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013) ("[T]he fact that harm in the forum is foreseeable, however, is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." (citation omitted)).

For all of these reasons, any alleged contacts between New York and the Internet Archive, Plaintiffs, or third parties are irrelevant for determining whether Kahle, Blood, GBLP, or the Foundation have contacts with New York.  As the complaint's own allegations make clear, there are no relevant contacts between these Defendants and this forum for *these claims*.  Thus, this Court cannot exercise personal jurisdiction over these Defendants here.

In light of Plaintiffs' dubious allegations to support personal jurisdiction here, it makes sense for the Court to transfer venue, because it would obviate any need for the Court to contend with this issue.  Indeed, courts in this district regularly consider and decide motions to transfer venue in lieu of answering these kinds of difficult jurisdictional questions.  For example, in *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, the district court noted that "it is doubtful that personal jurisdiction exists over [the defendants] in the Southern District of New York, but clear that personal jurisdiction would exist over them in the District of Kansas."  928 F. Supp. 2d 735, 742 (S.D.N.Y. 2013).  In those circumstances, it is "sensible" to "reach[] [the] venue motion in lieu of first addressing personal jurisdiction," because "a decision to transfer would

render [the] personal jurisdiction analysis with respect to the Southern District irrelevant." *Id.* at 741 (citation omitted). And the court in that case ultimately granted the motion to transfer, because the discretionary "factors overwhelmingly favor[ed] transfer." *Id.* at 743.

Courts in this district routinely reach similar conclusions. *See, e.g.*, *Enigma Software Grp. USA, LLC v. Malwarebytes Inc.*, 260 F. Supp. 3d 401, 408-09, 413 (S.D.N.Y. 2017) (deciding motion to transfer in lieu of deciding personal jurisdiction, and ultimately granting motion to transfer); *Mohamed v. Tesfaye*, 2019 WL 1460401, at *3, *8 (S.D.N.Y. Jan. 24, 2019) (same); *SBAV LP v. Porter Bancorp., Inc.*, 2013 WL 3467030, at *2-3, *12 (S.D.N.Y. July 10, 2013) (same); *G. Angel Ltd. v. Camper & Nicholsons USA, Inc.*, 2008 WL 351660, at *2, *7 (S.D.N.Y. Feb. 8, 2008) (same); *cf. Aspen Specialty Ins. Co. v. RCI Hosp. Holdings, Inc.*, 2023 WL 4080550, at *3-6 (S.D.N.Y. June 20, 2023) (granting motion to transfer because of lack of personal jurisdiction). That same approach makes sense here.

* * *

In sum, the Northern District of California meets all the requirements to be a district in which this action "might have been brought." That conclusion is underscored by the fact that this Court is a uniquely improper forum for adjudicating this case, because it lacks personal jurisdiction over multiple Defendants. But, at a minimum, the motion to transfer makes wading into those thorny questions of personal jurisdiction unnecessary.

## II.   THE INTERESTS OF JUSTICE SUPPORT TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA

Because the Northern District of California is a proper venue, the court must determine whether the public and private interest factors favor transfer to that district. *Eres N.V. v. Citgo Asphalt Refining Co.*, 605 F. Supp. 2d 473, 478-79 (S.D.N.Y. 2009). Here, multiple factors support transfer to the Northern District of California—including the locus of operative facts; the

location of relevant documents and evidence; and the convenience of the witnesses and the parties—and the factors favoring transfer outweigh the Plaintiffs' choice to file in the Southern District of New York.

### A.     The Locus Of Operative Facts For This Case Is The Northern District Of California

Fundamentally, the purpose of a motion to transfer is to ensure that a case is heard in the location of "the center of gravity of the litigation." *Viacom Int'l Inc.*, 774 F. Supp. at 868.  For that reason, "[t]he location of the operative events is *a primary factor* in determining a § 1404(a) motion to transfer." *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 745 (S.D.N.Y. 2013) (emphasis added) (quoting *Smart v. Goord*, 21 F. Supp. 2d 309, 316 (S.D.N.Y. 1998)).  Courts in this district have explained that "[i]t substantially favors transfer from this district when a party 'has not shown that any of the operative facts arose in the Southern District of New York.'"  *Id.* (quoting *Dr. Boy GmbH v. Nationwide Ins.*, 1996 WL 350699, at *2 (S.D.N.Y. June 25, 1996)).  Indeed, some courts have concluded that the lack of a "material connection between this district and the operative facts" not only *favors* transfer, but rather "*require*[*s*] the transfer of the action."  *Cohn v. Metro. Life Ins. Co.*, 2007 WL 1573874, at *3 (S.D.N.Y. May 31, 2007) (emphasis added).

Here, Plaintiffs' complaint makes clear that the locus of operative facts for their claims is the Northern District of California, and that the Southern District of New York has no material connection to this litigation.  Plaintiffs' claims are premised on the digitization, uploading, and streaming of their recordings in the Great 78 Project.  Each step of this process is tied to *California*—not this district.  And the complaint does not allege that *any* meaningful or material facts that give rise to their claims took place in the Southern District of New York.

16

First, with respect to the physical records themselves:  Some contributors to the Great 78 Project ship their donations of physical copies of 78 rpm records directly to California for use in the Project.  *See supra* at 5.  Once those records arrive, the Internet Archive manages the organization and digitization of those records from its headquarters in California, and those records are physically stored in California or Pennsylvania.  *See supra* at 5-6.  For the digitization process, the Internet Archive has partnered with GBLP.  Compl. ¶¶ 48-49; *see supra* at 5-6.  That arrangement was negotiated by the Internet Archive in California, and Internet Archive manages the digitization process from California.  Kahle Decl. ¶ 4; *cf.* Compl. ¶¶ 29, 48-49.  Once the recordings have been digitized, the Internet Archive manages the uploading process from California.  *See* Kahle Decl. ¶ 5; *cf.* Compl. ¶ 49.  And once those files are uploaded, Internet Archive manages its website, servers, and other physical infrastructure that makes the Great 78 Project operational from California, and these servers are physically located in California.  *See* Kahle Decl. ¶¶ 3, 5; *cf.* Compl. ¶¶ 49-50, 63.  In short, Plaintiffs' own allegations show that the nerve center of the Great 78 Project is the Bay Area and the Northern District of California.

In similar circumstances, courts in this district have easily concluded that transfer was appropriate.  For example, in *Capitol Records, LLC v. VideoEgg, Inc.*, a group of record label plaintiffs alleged that internet website defendants had infringed the plaintiffs' copyrighted works.  611 F. Supp. 2d 349, 355-56 (S.D.N.Y. 2009).  The defendants moved to transfer venue, and the court granted that motion.  As relevant here, the court found it significant that one defendant's "website was designed and developed in California and the alleged partnership with [the second defendant] was negotiated and implemented there."  *Id.* at 368.  And the court found it irrelevant that there was alleged "*injury* from copyright infringement" in the Southern District of New York, because "the copyrighted works are alleged to have been disseminated worldwide and the

*operative* facts that will determine liability occurred in the proposed transferee forum, [the Northern District of California]." *Id.* (emphasis in original).  So too here.

Similarly, in *Smart Skins LLC v. Microsoft Corp.*, a patent infringement case, the district court granted a motion to transfer after concluding that "the locus of operative facts is clearly the State of Washington"—the headquarters of defendant Microsoft, who was alleged to have infringed.  2015 WL 1499843, at *8 (S.D.N.Y. Mar. 27, 2015).  As the court explained, the "inventors of the patented inventions worked . . . in Washington," and "Microsoft developed the [allegedly infringing products] in Redmond, Washington."  *Id.*  And "[t]o the extent that any relevant technology was developed outside that state, it was developed by Nokia outside the United States or in San Diego, California, and not in New York."  *Id.*  The same could be said here.  The bulk of the allegedly infringing conduct took place in California; and to the extent that any conduct took place outside that state, it took place in Pennsylvania, not New York.  All of this favors the conclusion that the locus of operative facts is the Internet Archive's headquarters in San Francisco.

By contrast, the most that Plaintiffs can say about New York is that "Defendants have harmed Plaintiffs in this District," Compl. ¶ 37, and that two of the Plaintiffs are headquartered in New York, Compl. ¶¶ 22-23.  But the fact that there are users of the Great 78 Project in New York could be said of multiple states (such is the nature of the internet).  Indeed, as the complaint concedes, New York is not even the state with the *most* users of the Great 78 Project.  *See* Compl. ¶ 37 (alleging that New York was "the state with the second-most total downloads and streams" since the beginning of 2020).  And Plaintiffs do not point to anything beyond the mere residence of Sony Music Entertainment and Arista Music in New York.  Most significantly, they do not allege that any of the activities engaged in by Internet Archive, Kahle, Blood, GBLP, or the Foundation took place in New York.  Nor could they.  As the complaint makes clear, the only other

location besides California that could conceivably be a locus of operative facts is *Pennsylvania*—where Blood and GBLP are located and carry out their digitizing activities.  *See* Compl. ¶¶ 12, 32-33, 48-49.

The long and short of it is that this case has nothing to do with New York, and an awful lot to do with California.  Thus, this factor requires (or at a minimum, strongly favors) transfer.

**B.     Transfer To The Northern District Of California Would Provide Easier, Efficient, And Effective Access To The Evidence And Witnesses At The Heart Of This Case**

Courts often describe the convenience of witnesses and access to evidence as among the most important considerations when deciding a motion to transfer.  *See, e.g.*, *Enigma Software Grp. USA, LLC*, 260 F. Supp. 3d at 410.  The location of documents and evidence, along with the convenience and availability of witnesses, all favor the Northern District of California.

First, access to evidence and sources of proof favors the Northern District of California. The Great 78 Project primarily relies on libraries and members of the public to donate 78 rpm records.  They often send their records to the Internet Archive both for digitization and for long-term preservation.  *See supra* at 5.  At last count, the Internet Archive had approximately 200,000 physical 78 rpm records in its collection.   *The Great 78 Project*, Internet Archive, https://great78.archive.org/ (last visited Oct. 31, 2023).  And the process of digitizing the records in the Project's collection is ongoing.

Access to the physical records that have been, are being, and will be digitized is plainly relevant to Plaintiffs' claims of alleged infringement, which are explicitly based on that digitization process.  And they are also likely to be relevant to Defendant's anticipated defenses, which could include (among other things) evidence that the vast majority of the Great 78 Project's digitization efforts are of "orphan" recordings not otherwise available to the public at all, or evidence of the unique quirks and character of the original 78 rpm recordings that make their preservation so

19

essential and a quintessential "fair use" under copyright law.   Moreover, to the extent that other

documents and evidence are necessary for this case, Defendants "are likely to produce the bulk of

th[at] relevant evidence" because they are "the accused infringers."   *CYI, Inc. v. Ja-Ru, Inc.*, 913

F. Supp. 2d 16, 24 (S.D.N.Y. 2012).   And the vast majority of this other relevant evidence in

Defendants' possession is likely to be held by the Internet Archive, in the Northern District of

California.   As other courts facing similar facts in alleged infringement cases have explained, "this

factor weighs in favor of transfer to 'the place where the defendant's documents are kept.'"

*Capitol Records,* 611 F. Supp. 2d at 368 (citation omitted).   All of this physical evidence

distinguishes this case from one involving, for example, a documentary record that can be easily

transferred electronically.   *Cf. Eres N.V.*, 605 F. Supp. 2d at 481 (concluding that location of

evidence was not significant in case where the documents could be transferred electronically).

This factor favors transfer.

Second, the convenience of witnesses favors the Northern District of California.   The

primary witnesses with information about the Great 78 Project are likely to be either Defendants

themselves or other witnesses from the Internet Archive.   *See, e.g.*, *Freeplay Music, LLC v. Gibson

Brands, Inc.*, 195 F. Supp. 3d 613, 617 (S.D.N.Y. 2016) ("Typically in a copyright infringement

action, the key witnesses are those individuals who were involved in the design, production, and

sale of the allegedly infringing product.").   For that reason, it is plainly more convenient for the

Internet Archive's witnesses and Kahle to testify and participate in this litigation in the Northern

District of California than in the Southern District of New York.   And although Plaintiffs have

suggested that New York is more convenient for Blood and GBLP (given their location in

Philadelphia), Plaintiffs have not alleged that Blood or GBLP regularly travels to New York or

conducts business there.   By contrast, GBLP (and through GBLP, Blood himself) has an ongoing

commercial relationship with Internet Archive and San Francisco, making the Northern District of California more convenient than the Southern District of New York for these Defendants and witnesses as well.  *See, e.g.*, Compl. ¶¶ 12, 48-49; Kahle Decl. ¶¶ 4-5.

And, given the fact that only some of the Plaintiffs are located in New York, it "is not necessarily more convenient" for Plaintiffs' witnesses to litigate in the Southern District of New York either.  *See Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 374 (S.D.N.Y. 2006) ("New York is not necessarily more convenient for [plaintiff]'s witnesses, as only some of them reside in or near New York.").  Indeed, two Plaintiffs—UMG and Capitol Records—are themselves located in California, likely making the Northern District of California significantly more convenient to witnesses who reside there than litigation on the East Coast.  *See* Compl. ¶¶ 24-25.

Third, the availability of process to compel witness attendance also favors the Northern District of California.  As explained, the majority of the witnesses and documents for this case are likely to be produced by Defendants.  And if those witnesses are located at the Internet Archive's headquarters in the Northern District of California, this Court would lack the subpoena power to compel the attendance of unwilling witnesses in New York.  *See, e.g.*, *Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 27-29 (S.D.N.Y. 2016); *see also* Fed. R. Civ. P. 45(c)(A) ("A subpoena may command a person to attend a trial, hearing, or deposition only . . . within 100 miles of where the person resides, is employed, or regularly transacts business in person . . . .").  More broadly, however, the question whether the Court has power over individuals in this suit also raises the analogous question of the Court's personal jurisdiction over multiple Defendants.  There are, at a minimum, serious questions in this case whether the Court can exercise personal jurisdiction over Defendants Kahle, Blood, GBLP, and the Foundation.  *See supra* at 10-14.  Given those questions,

the broader inquiry of the Court's jurisdiction and authority over the parties, when considered alongside the obvious availability of personal jurisdiction in California and compulsory process to compel the attendance of Defendants' witnesses, supports transfer here.  *See Everlast*, 928 F. Supp. 2d at 742.

In sum, these factors—access to evidence, convenience of witnesses, and availability of process—strongly favor transfer to the Northern District of California.

### C.      The Relative Means And Convenience Of The Parties Are Neutral Factors

The relative means and convenience of the parties are not significant considerations here. This is not a case that involves a better-resourced defendant seeking transfer against a plaintiff of limited means.  *See, e.g.*, *Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 31 (S.D.N.Y. 2016) ("Where disparity exists between the parties, such as an individual plaintiff suing a large corporation, the relative means of the parties may be considered." (citation omitted)).  It is common sense that there is no serious burden from a financial perspective for Plaintiffs—who are sophisticated corporations with national or international operations—to litigate this case in the Northern District of California. *See Smart Skins LLC*, 2015 WL 1499843, at *8-9 ("Microsoft is a large corporation and is undoubtedly able to litigate a case—even a complex patent infringement case—in this district without suffering meaningful hardship."); *Herbert LP v. Electronic Arts Inc.*, 325 F. Supp. 2d 282, 290 (S.D.N.Y. 2004) (similar).  Indeed, most of the Plaintiffs are already undertaking the financial burden of litigating far from home—UMG and Capitol Records are headquartered in California, while CBA and CMGI are headquartered in Tennessee.  Compl. ¶¶ 24-27.

Likewise, the convenience of the parties is, at best, a wash in these circumstances.  The Northern District of California would certainly be more convenient than the Southern District of New York for the Internet Archive, Kahle, and the Foundation, as well as (presumably) Plaintiffs UMG and Capitol Records, given their headquarters in that state.  Compl. ¶¶ 24-25.  Defendants

Blood and GBLP similarly would prefer the Northern District of California, given their established business relationship in that district.  *See supra* at 5-6.  For others, like Plaintiffs CBA and CMGI, who are headquartered in Tennessee, perhaps the relative convenience of California or New York is neutral, Compl. ¶¶ 26-27, while the New York-based Plaintiffs Sony Music Entertainment and Arista Music might prefer the Southern District of New York, *id.* ¶¶ 22-23.  In light of the other considerations above—the locus of operative facts and the access to evidence and witnesses—convenience does not move the needle.  *See Smart Skins*, 2015 WL 1499843, at *10 (giving this factor little attention where one party "would find it more convenient to litigate in Washington" while the other "would find it convenient to litigate in New York"); *Whitehaus Collection v. Barclay Prods., Ltd.*, 2011 WL 4036097, at *5 (S.D.N.Y. Aug. 29, 2011) (similar).

    **D.**    **Plaintiffs' Choice Of Forum Is Entitled To Little Weight And Outweighed By Other Factors**

On their side of the scale, Plaintiffs have primarily pointed to the fact that they chose this forum.  *See* ECF No. 41-1 at 2-3.  But "the importance of the plaintiff's choice of forum measurably diminishes" if "the operative facts have few meaningful connections to the plaintiff's chosen forum."  *Harris v. Brody*, 476 F. Supp. 2d 405, 406 (S.D.N.Y. 2007); *accord Smart Skins*, 2015 WL 1499843, at *5 (same); *Capitol Records*, 611 F. Supp. 2d at 368 (same).  As explained above, this district has no meaningful connection to this case, which has its locus of operative facts in the Northern District of California.  *See supra* at 16-19.  Moreover, "the plaintiff's choice of forum receives less deference when that forum is not the plaintiff's home district," as it is not for most of the Plaintiffs.  *Garnish & Gather, LLC v. Target Corp.*, 2019 WL 6729152, at *2 (S.D.N.Y. Dec. 11, 2019); *accord Pence v. Gee Grp., Inc.*, 236 F. Supp. 3d 843, 856 (S.D.N.Y. 2017) (same); *Rindfleisch v. Gentiva Health Sys., Inc.*, 752 F. Supp. 2d 246, 252 (E.D.N.Y. 2010) (similar); *see also* Compl. ¶¶ 24-27.

Together, these two facts—that only two of the six Plaintiffs reside in this district, and "the locus of operative facts lay[s] elsewhere"—compel the conclusion that "plaintiffs' choice of forum is 'entitled to little deference'" here. *Fuji Photo Film Co.*, 415 F. Supp. 2d at 376 (quoting *Iyalla v. TRT Holdings, Inc.*, 2005 WL 1765707, at *6 (S.D.N.Y. July 25, 2005)).

## CONCLUSION

For all of these reasons, the Court should transfer this case to the Northern District of California.

Dated: November 1, 2023
         New York, New York

Respectfully submitted,

**LATHAM & WATKINS LLP**

*/s/ Allison L. Stillman*
Allison L. Stillman
1271 Avenue of the Americas
New York, NY 10020
Tel: (212) 906-1200
Fax: (212) 751-4864
Email: alli.stillman@lw.com

Andrew M. Gass (*pro hac vice*)
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
Tel: (415) 391-0600
Fax: (415) 395-8095
Email: andrew.gass@lw.com

Dennis Mai
12670 High Bluff Drive
San Diego, CA 92130
Tel: (858) 523-5400
Fax: (858) 523-5450
Email: dennis.mai@lw.com

24

Brent T. Murphy (*pro hac vice*)
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: brent.murphy@lw.com

*Attorneys for Defendants Internet Archive,
Brewster Kahle, George Blood, and George
Blood L.P.*

**CONRAD | METLITZKY | KANE LLP**

*/s/ Jesse Lanier\**
Jesse Lanier
Mark Conrad
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 343-7100
Fax: (415) 343-7101
Email: jlanier@conmetkane.com
        mconrad@conmetkane.com

*Attorneys for Defendant Kahle/Austin
Foundation*

---

\* Defendants use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's
ECF Rules and Instructions.